We're hearing oral argument in number 20-1422 United States v. Safehouse and we have Mr. McSwain and Ms. Eisenstein. Mr. McSwain, whenever you're ready. Good morning, thank you judge. May it please the court and counsel, I'm Bill McSwain for the United States and with the court's permission I would like to reserve five minutes for rebuttal. That's fine, we'll probably, time probably won't be much here in this case anyway. Well I want to start with what I'll call the district court's big idea and of course I'm asking you to reverse the district court opinion, Safehouse is asking for you to uphold it, so I think it's important to talk about the real underpinnings of the decision and this is what the district court also called its baseline reality and that baseline reality and that big idea as I'm referring to it is the idea that because Congress at the time that it passed the relevant section of the CSA was not specifically thinking about injection sites, that that idea had significance, that idea was really important and in fact because of that idea the district court believed that it statute and something very significant happened after we filed our brief but before Safehouse filed their brief and that was the Supreme Court's decision in Bostick versus Clayton County. Now Bostick did not announce a new rule of law, it was essentially reinforcing principles that already existed but it's a very important case because it's from the Supreme Court and even though it is Bostick I think is extremely important to this case and the logic of Bostick essentially says this, look at the words of the statute, look at the words of the statute and furthermore the big idea that the district court had that sort of caused it to go down this long tangent, that big idea is absolutely irrelevant. Mr. McQueen, Bostock involved a civil law, this is a criminal law that has very substantial penalties of up to 20 years imprisonment. Shouldn't we be pretty sure the law is clear? That's a consideration that wasn't at stake in Bostock. Your Honor, I think that's correct, I think we should make sure that the law is clear and we would submit that it is and for example the rule of lenity we don't think applies here because that rule would require grievous ambiguity. I think those are the exact words that the circuit's law has pointed to that has to have grievous ambiguity and in fact it has to be something that is really the last, it's almost as if it's the last resort. That's a rule you only go to if there's, you just can't make sense of the statute at all and I don't think that's the case here. If we talk about how far your construction goes, let's say I'm going to give you some hypos, I want to know how you read A56-A2. Let's say a landlord knows his tenant is regularly doing drugs in in his house in the basement apartment or something like that. Is A56-A2 going to cover that? He knows it's going on, he's collecting rent as a result of it, the tenant is using the basement apartment in order to shoot up. Is that criminalized by this provision? Your Honor, I don't think it is and as we explained in some of our briefing, that is incidental use. You could think of it as incidental use, you could also think of it as personal use. Not the kind of concentrated drug activity that the statute was intended to reach. Let's say a landlord in one of those self-storage units rents out one of those small units and the person goes from his house to there just to go to shoot up and the landlord's been in there enough times, seen enough syringes and things. Person goes into the small self-storage unit, shoots up and leaves. Is that going to be covered? These are all a matter of degree and as you push harder and harder on the hypo, I think we get closer and closer to criminality. In that exact example, certainly if the person is renting the storage locker for another purpose, that also I think would move us towards the line away from persons. Okay, let me ask you another question then. You brought the action for declaratory judgment against Safe House. You didn't bring it against, quote, the consumption room, unquote. Therefore, in looking at the activity, in looking at the purpose of the activity, do we look at Safe House, the whole establishment there, or simply at the consumption room? Judge Rob, I think you have to look at Safe House and Safe House is who we brought the action against, but the defining characteristic of Safe House, in our view, is the consumption of drugs, is the consumption room. In spite of all the other activities and services that are provided there? Yes, and I would point you towards the activities and services that are provided at, for example, Prevention Point, which is a sister organization. But Safe House does have a consumption room, but it also has all the other services, and since you brought the declaratory judgment against Safe House, don't we have to look at Safe House as a whole? I think, yes, you do, and I don't think we've said anything in our briefing or our arguments previously that says that Safe House can't be looked at as a whole, but the defining characteristic of Safe House that makes it different from Prevention Point or any other similar organization is the consumption room. I think what Judge Roth is getting at, the statute talks about the purpose, not a purpose. They have a number of purposes at this site, and you were suggesting in response to my hypo that, well, if the person is storing things there, maybe it's different, but don't you have to read the purpose to mean it can include a number of purposes? The district court talked about a significant purpose. I mean, you have to be able to include multiple purposes. Otherwise, they've got some other purposes here, like providing services and treatment and shelter and some other things, so you can't satisfy a strict sole purpose requirement. So, you've got to read the purpose more broadly than that. I think that's right, and I think that the cases do talk about a significant purpose. They talk about a significant purpose as opposed to the one and only purpose. How does that fit with the law and the text? Well, it's interesting because that is an only purpose, but maybe one of the purposes, but it has to be a significant purpose, but your question raises another interesting point, because at the end of A2, which is what we're talking about here, which is the purpose of unlawfully manufacturing, storing, distributing, or using controlled substance, we're talking about the purpose of the third party. That's the way five different circuit courts have interpreted it. Okay, you say that. I don't necessarily agree with you on that. I think Chen is wrong. I think if you use classic statutory interpretation rules that for the purpose of and to contiguous sections should be interpreted in the same way. So, when you are assuming that we agree with you on purpose of, let me just forewarn you that I don't agree with you at all. I would respond to that in two ways, Jezreel. First of all, we have to read A1 and A2 to make sense together. I do. I realize that, and I do do that, and I still say that they're different. Different, but that for the purpose of is the same. If I could respond to that in two ways. First of all, I think that if you read A1 and A2 without looking at the purpose of the third party in A2, you set up a situation that leads to absurd results. For example, you could be a crack dealer. What would you say then about the situation where you have a crack dealer who says, my purpose is making money. My purpose is not to sell drugs or have drugs be used on the property. My ultimate object, my ultimate aim is to make money. If you interpret A1 and A2 in the way that you're suggesting, I don't think that there's any way for liability to attach under this statute for a stone-cold crack dealer. If you are limiting yourself to, quote, the main purpose, but if you are considering a variety of purposes, I think that your argument doesn't make it. Let me ask you, since we're talking about this language, where in the substance? Well, the language, I think, of A1 and A2 talk about illegal use of control. They talk about using. They talk about unlawfully using. Where is it unlawful to use? The statute and the legislative history do talk about possessing sometimes and not necessarily talking about using in our position. But State House never possesses any drugs, right? State House doesn't, but the people who, the third party obviously does possess, and our position is you can't possess, I'm sorry, you can't use without possessing. One follows the other. Okay. But that is interpreting that you've got to admit that under the statute there is no unlawful use. I don't concede that there's no unlawful use. I think that use and possession... Okay, where is it? What section? I think you can look at A1 and A2, for example, and say that it says unlawfully using a controlled substance. How are you unlawfully using if it's not unlawful to use? The statute does make clear, we're talking about heroin, for example, that there is no accepted use of heroin. There is no lawful use of heroin. Doctors, for example, can't prescribe heroin. So if you're talking about using or possessing or anything having to do with heroin, it is automatically illegal. Mr. McSween, a couple questions. First of all, does the word unlawfully extend all the way down all four of those participles? In A2 are you referring to? In A2, does unlawfully modify manufacturing and storing and distributing and using? Yes, I think I would concede that. Does unlawfully include violations of state law? We are talking about here a question of federal law. Why couldn't it piggyback on a violation of state law, that at least wherever it violates state law, that's sufficient. Like in Rice? Mm-hmm. Not necessary, but sufficient. It's a path that we didn't go down in our briefs. I guess I would not foreclose it. If it's something that the court thinks is an important consideration, I certainly wouldn't foreclose that possibility, but I don't think it's necessary. I think that federal law is being violated here, and if I could, if I could get the use of the word purpose. I understand that one of the things that I think she's concerned about is that you have the word purpose in A1, and you also have the word purpose in A2. Why would they be different? My response is that we're not treating them differently. The definition of purpose is still the same in both, but by looking at the context of all the words in the statute, we think that it's clear that when you're talking about purpose in A1, you're talking about the defendant, and you're talking about the purpose in A2, you're talking about the third party, and again, the reason to do that is because the statute becomes self-defeating if A1 and A2 refer to just safe house's purpose, just like it would refer to just the purpose of a crap dealer. You could say that my purpose is to make money, and safe house doesn't deal with that hypo in their briefs, and that's something we've been talking about throughout this case. They have no good answer for that. There's no way that A1 and A2 fit together under their reading. Mr. McSwain, let's assume that Judge Roth's skepticism is warranted, and you need to prove the first party's purpose, not the third party's purpose. Can you do that here? Absolutely, and we went into that in some detail in our briefing about how even if A1 and A2 are of seeing that drugs are used at the place because it is a necessary precondition to anything else that is happening at safe house. If people are not coming into safe house for any, there's a necessary precondition of using drugs. It's true that there are other services that are provided, other things that are going on in safe house, just like in prevention point, but it is a necessary precondition to use drugs, and because of that, as I laid out in our briefing, we think that we win under either scenario. I think the word clearly maybe slides over this. I wonder whether Ms. Eisenstein would dispute that it's necessary. I mean, it might be one draw for people to come in, but you kind of just noted and hesitated that people might come in for clean syringes not to use at that location, so I don't know that it's a precondition. It might be an inducement, but if there are other reasons why some people might come in and it's not a necessary precondition, do you still win or can you still win? I think the best way to describe that, and maybe it's that I'm not being as precise in my language as I should, it's a necessary precondition for safe house to exist because there wouldn't be any reason for safe house to exist absent the consumption room because, again, you would have prevention point, you would have other places that you could go, and so literally the only reason for it to exist is the consumption room. Even if, hypothetically, somebody could come into safe house and not be there to ingest drugs, I think that is very unlikely, and if you look at the factual stipulations in the case that both parties agreed to, this is not a place that's set up people to come in to just get treatment. It's a place that's set up for people to ingest drugs, and in fact, even those who are there to get treatment, one thing that safe house has said is that treatment, they think, is more effective if people are actually using the drugs. Could I ask you about a couple more hypo's? What if a person has a marijuana dispensary? Is that going to be covered by this law? That's getting into state law issues. My understanding is that Congress has made certain appropriations where if you're in a state that has legalized medical marijuana, the Department of Justice cannot prosecute those sort of violations. But it's still illegal. They may not prosecute it, but it's still against the law. Could they prosecute? Could the feds prosecute in that situation? I mean, maybe what you're saying is they'd be barred, but could you have a civil recall case or something else that would be brought, predicated on that? As a practical matter, your honor, I don't think that we can prosecute that because of the way that Congress has done its appropriations. Let's say it's marijuana. Bank owns a mortgage in a cocaine dealer's house, so we don't have the marijuana issue in there. Or a marijuana dealer's house in a law that complicates that non-prosecution rule. Can you go after the bank under this? I'm sorry, I got a little bit confused between the two hypotheses. You're talking about a bank? A bank has a mortgage. It's the mortgagee. It lends money to a drug dealer, and the drug dealer uses the house, not as his principal residence, just as a place to deal drugs out of. Can the bank be prosecuted for making that loan, assuming it knows at the time it makes the loan that the guy's a drug dealer and going to be using it for drug dealing? Again, I think the first part is to, the first step is to look at the statutory language. And if they had the knowledge, so knowingly, and if they had the intention to make a loan knowing that this was going to occur, then theoretically, yes, they could be prosecuted under the statute. Can I just run through with you a series of questions, just almost starting back at the beginning in terms of the interpretation. What does A-1 apply to? What does A-2 apply to? And what is covered by A-2 that's not covered by A-1? That's the starting point for me. Under our reading, Your Honor, A-1, if you can think of it as sort of, you're not allowed to directly set up a drug house. You as the owner or as the person who's leasing it or renting it out or maintaining it, you can't directly set up a drug house by having your purpose being the manufacturer, distribution, or using of the controlled substance. Whereas A-2 says you can't do the same thing. You can't set up a drug house indirectly by controlling it or managing it and knowing that a third party has that purpose of using it. But there's no mention of a third party in the statute. Why didn't Congress spell it out? Well, the statutory drafting, Your Honor, it could have been better, I would say. Really? Really. This version is not perfect, but I would say that the government's, I would submit that the government's interpretation is a better interpretation because it is still, it is faithful, I think, to the plain language It doesn't talk about specifically a third person there. You're absolutely right, Judge Bevis. But when you look at the statute as a whole, again, it's the only one that makes sense. I come back to my hypo about how you could have bad actors escaping liability here if it's not a third party's purpose that matters in A-2. I guess I'll come to it in this way. It seems to me if we were pre-COVID sitting around just all talking about this, you would have five attorneys in a room and you probably have five different opinions. And some would say the text is not ambiguous. Some would say it's ambiguous and here's what it means. Somebody else would say, well, maybe it's ambiguous, but here's what I think it means. Doesn't that, in effect, tell us, you know, normally we try to shy away from legislative history, but doesn't that tell us that we ought to at least take a look and see what the legislative history is here? For purposes of argument, Your Honor, let me just say, yes, let's go into that world. And I think that if we were to go into that world, what we find is that Congress was very concerned about concentrated drug activity. And one of our amici who represent 20 different neighborhood associations, as well as the SLP, Fraternal Order of Police, go into this in some detail in their brief about how that was the primary concern of Congress here. The concentrated drug activity and the attendant crime and blight and destruction of neighborhoods that comes with it. And so this is exactly the type of thing that Congress was concerned about, even though they didn't specifically know about injection sites. And I think that what happened when Safehouse tried to open up the disastrous aborted attempt at the beginning of the year to open up shows exactly the concern here, because the city essentially revolted. Certainly South Philly revolted when when Safehouse tried to basically sneak this into a neighborhood without giving them the input into whether they wanted or there's not a single neighborhood in the entire city who is ever going to want this in their neighborhood. And that's why you saw such an uproar. And you saw almost the entire Philadelphia City Council also come to the neighborhood's defense. And they were in the process of drafting legislation to say, as a local matter, these sites are illegal when the pandemic hit, everything got sort of derailed at that point. And then we also got the stay of decision from the district court. But to answer your question directly, Congress was concerned about the concentrated drug activity and all the negatives that come with it. And so even if you look at the legislative history, it counsels, I think, strongly in favor of finding safe houses proposed activity to be illegal. Mr. I don't with my colleagues want to stay on the statute. I don't want to jump ahead, but I do want to get to the constitutional issue. Yeah, I do, too. But I do want to stay on the statute for a bit. If a two, if knowingly, intentionally and for the purpose of apply to safe house as opposed to anyone else, do you still win? Absolutely. And I think we've laid that out in some detail in our brief. Um, we talk about how, um, a significant purpose is clearly something that use of drugs here is a significant purpose. Again, I would come back to what I've said before about how it's a necessary precondition for the existence, the literal existence of this of this, um, operation. There would be no need for it, and there would be no push for it. There'd be no call for it if it didn't have the consumption. Prevention point already exists. So we win under either reading whether a one and a two are both talking about the purpose of safe house, or I think a better reading is if a one is talking about the purpose of safe house and a two is talking about the purpose of the third party. Let me ask. Let me ask you in terms of hypotheticals. Let's say this is not South Philly. Let's say the neighbors were not uptight about it. Let's say it's an adjunct to pick hospital pen, and you have a rehab drug facility right there, right outside pen. Is that rehab drug facility a violation of and they allow people as part of the weaning process to use drugs that are unlawful before they go into methadone or something like that? Would you prosecute that? I would say that that is illegal, Your Honor, and that's why it doesn't exist and never has existed. There's no medical use accepted medical use of heroin. And when you're talking about drug treatment centers, they do not inject people with heroin. Never have. There's no place in the country that does that. This is trying to be the first place in the country anywhere does this sort of thing. So I don't have any cases that I can point to that say we prosecuted that in the past, but the only reason is because the medical facilities haven't done that. And if they were to do that, yes, they would be exposing themselves to risk under the statute, which is why they don't do it. Let me say there was you misspoke there. You said where where they inject safe house does not inject anything, right? The day that I was referring to was the rehab facility that Judge Ambrose was describing. Yeah, not the rehab facility, but rather they let the the person coming in who's being treated inject. Yes. And and Judge Roth to be responsive to what you're asking. Yes, it's not safe house that's doing the injecting. That's I agree with you on that. But that doesn't mean that there's not liability in the statute under argue. All right, let me ask you. So let's go to a law firm over on. Let's go to JFK Boulevard and a big law firm has one of its partners who is on drugs. Firm knows that the partners on drugs. He's become a coke addict and they're supplying him space. And they they don't know what to do, but they give him space. They know he's using cocaine in his office. But that is the firm liable under a two. I think that's similar to the hypo where you have parents, for example, in their house and they have their son or daughter who's using drugs. But we would say that's again because because because two reasons. One, it's incidental. That law partner presumably is still there to be a law partner is still there to be an attorney is using that space for its original purpose, which is to practice law. And secondly, it's not concentrated drug activity. But if that law partner words to invite fellow addicts into his office or fellow addicts into the firm and suddenly you had to concentrate a drug activity. Absolutely. That law firm could stand by to be charged. Let me let me tweak the hypo then. Okay, so you've said the parent whose kid lives at home who happens also to do drugs as the main purpose is to have the kid live here. Let's imagine the kid is hope chooses to be out on the streets. Almost right. And the parents say we're worried about you overdosing. You overdosed once before at least come over here when you shoot up. Okay, so we can watch you and give you Narcan if we need to. Is that going to be covered? He comes over just for when he's going to shoot up and then leaves. So he doesn't live there. He doesn't sleep doesn't live there. He comes over just to shoot up because the parents want to keep an eye on him. That's getting closer to the line. I think that probably would not trigger liability again. Because it's one person. Let's say he and a friend he invites a friend over and they're going to do it together. He says I'll only do it if I can do it with my girlfriend. As you add more people to the equation, it comes closer and closer to line of criminality. And I'm not trying to be cute here. Because I think it's a matter of degree. But absolutely your hypo could lead to liability under the statute. If you get a group of people who are coming to that parent's house and doing that, and I would tweak the hypo myself a little bit and say, how about this? How about if the parents know that the son or daughter is using drugs in the home, and they know that they have lots of friends who use drugs and the parents say, you know what, we're going on vacation for 30 days, we're going to be gone. And they know what's going to happen when they're gone. And their son or daughter is going to invite lots of people over to the house, and it's going to turn into a drug then those parents could be prosecuted. That's a little bit slightly different from your hypo. But I think shows the point that these things are a matter of degree. All right, Airbnb. There have been some press reports out there. I can't vouch whether they're true or not. Let's just assume that some Airbnbs are now being rented for wild parties where things get trashed. Let's assume some Airbnb customer is known to have had drug filled parties. It made it into the news in the last few weeks. Is, I mean, Airbnb is a platform, assume it comes to their attention, and assume they continue to rent to this person. Those are big yes. And I'm not saying Airbnb actually does this. But if they did that, would they be liable? Would the host be liable if the host sees this in the person's reviews or ratings and still rents to the person? I think again, we always have to return to the words of the statute. And if under the statute, if the the Airbnb renter knew what was going on, and intentionally rented the space knowing that it was going on, then yes. I mean, that's sort of very similar to since we've opened up the Pandora's box of legislative history here. That's sort of similar to what Congress was talking about with rave parties, and other similar gatherings where it was one of the reasons why they passed this statute. Again, it comes down to the words of the statute are most important. And then also, what is Congress trying to prevent here, concentrated drug activity. And the hypo you described really all the hypos you've described, once you get to concentrated drug activity, you have triggered the statute and you can be prosecuted. What's weird though, is your concentrated drug activity only comes from the legislative history. I don't see any of the text that limits it to that. I would prefer not to go into the legislative history. I prefer to limit to the text. If you want to stay with the text, what in the text would make it be just the would exclude the one kid whom the parents have over for drugs? I think that I think we did address this in our brief in a footnote about the hypo of the child in the parents home. I think the word intentionally is what is a check on the statute where incidental uses, incidental uses that are not the primary use. The child is living in the home, and it's incidental that he's but the parents are saying, you weren't living here, come here to do your drug injection so we can watch you. Now, that's intentional, right? I think that you could, again, that hypo is getting close to liability. But I would say still that it's incidental use because it's a parent looking out for the child. And there are also things I think, I don't think we can make it quite as clean as the child just comes in the door, injects drugs and leave. I think you're talking about the family situation, it's more complicated than that. There are other purposes other than just that purpose of sticking a needle in the child's arm. Just trying to think... There's another hypothetical. Instead of doing this in a building, you get a recreational vehicle and park it in front of the building. Now, my understanding is the government has said that that would not violate the statute. You park the vehicle in front of the building for injection and supervision while the drug users inject. Does that violate the statute? Again, I would return to the words of the statute. And Your Honor, frankly, the words of the statute are talking about real estate. A vehicle is not real estate. And so if you're being true to the words of the statute, I would say it doesn't reach that conduct. But that's because Congress has passed what Congress has passed, and we need to be faithful to the words of the statute. So... Well, I think it's more faithful to certain words than I am, and vice versa. So it seems to me we are selectively picking the words that we're faithful to. Well, I'm not trying to be selective about what I'm being faithful to. I'm looking at the statute and seeing words like lease, rent, place... You can lease an RV. You can rent an RV. You can own an RV. It's your position that place does not include movable vehicles. It's just physical locations, like real estate. Yes. I think we also talked about an example of a mobile van in the district court a little bit, and we... Yeah. And you could see that it did not fall under the statute that mobile van applies, and Congress would have to deal with that situation. But also, if it's a mobile van, it's also moving around, so you're not talking about the concentrated drug activity in one place. Presumably, that van is gonna be going to different places. Just a dumb question, but if you manage or control a place inside a motor vehicle or an RV, as an owner, and knowingly and intentionally make it available for use for people to come into that RV for the purpose of drug activity, why is that different than what we have here? If you just look at the words of the statute. Well, if I followed that correctly, were you adding... I'm looking at the words. If you manage or they control a place inside of an RV as an owner, and they knowingly and intentionally make it available for use for the purpose of allowing persons who are doing drugs to have drug activity inside that particular place. First of all, it's not a dumb question. But I don't... The government, I would say, our position is that we interpret the plain language of A1 and A2 to be talking about real estate in the sense of places, not a car. I guess, theoretically, it's possible to say there's a place inside of a car or a place inside something that's mobile that the language could reach. But I think when you talk about... When you look at the words as a whole, and also, if we're gonna talk about legislative history, we're gonna talk about real... I'm not talking about legislative history, I'm just looking at the words here. What pops in my mind is when you're in really rural America, there are no doctor's offices and you have physician's assistants to go around in RVs helping people who have medical issues. And so, I don't know why the text you're saying has to be a real estate, but doesn't have to be or is not the inside of an RV. Well, maybe it's something that I just haven't... Honestly, haven't thought about enough because it's not part of this case and not something that we've seen in other cities who have contemplated this sort of thing. But I guess, theoretically, if you had a mobile unit or something like that that kept putting itself down in one spot, then it would be much closer, I think, to the kind of thing that we're talking about here, because then it would be a place. I don't think you can be cute and get around the statute by loading your RV up with heroin and then parking it outside or parking in one particular place and having concentrated drug activity around it. Theoretically, that might violate the words of the statute, but I think that that would be a very different case than this, is the point that I wanna make. Safe house is a place, or safe house wants to be a place, and it's gonna be in one spot. That's part of the... Essentially, what I'm hearing you say is, look, this is part of your job, you're saying, part of my job as one who prosecutes. This is either prosecutorial discretion or our interpretation for purposes of how we are going to implement this particular statute. Well, maybe I would put it slightly differently, and I would say that I, as a US attorney, am only reacting to a set of facts in front of me, and the set of facts here, in this case, we have safe house, which just clearly wants to be a place. These hypotheticals are important to think about, and there needs to be limiting principles to whatever decision that you come up with. But what we're describing in hypotheticals is very different from this case, very different from what safe house wants to do. Yeah, the reason we're giving you so many hypotheticals is because we're trying to see what are the consequences of whatever decision we write here. Well, again, I'm wanting to be just completely candid and straightforward. It's not a perfect statute, and if there's a problem where there might be a way that mobile vans start popping up all over the place, we'd have to decide whether that's something to prosecute. It might have to be something that Congress would have to address if Congress thinks it's a problem, but I think they've clearly already addressed the situation where we're talking about a piece of real estate, safe house opening up, having a consumption room, that is a defining characteristic of the construction. Go ahead. I think Judge Roth had a question. Finish this line. Go ahead. I think Judge Roth had a question, then I'll come back to... No, no, I'm fine. Okay, Judge Bevis, go ahead. Yeah, if my colleagues are done with the statutory issues, I do wanna spend some time talking about the Commerce Clause here. First one is, safe house is making this site available for drug use without compensation. Is that economic or non-economic, and does the word economic or non-economic mean the same thing as commercial or non-commercial here? I think what Congress has said is that the drug trade has an effect on interstate commerce. They said that broadly, and there isn't any exception for what safe house describes as local use or non-commercial use or the like. They said broadly that use of illegal drugs is something that impacts interstate commerce, and there's not some cannon of donut holes, to borrow the language from Bostock, where you can say, well, if this specific thing is not... If this jurisdictional element hasn't been pulled out, then it doesn't violate the Commerce Clause. But I think your adversary's argument is Lopez and Morrison treated differently activity that was non-economic. So why, in your view, is this on the other side of the line from Lopez and Morrison? There's a connection between gun violence or violence against women and the economy, and guns move in interstate commerce. Why should we put this one in a different basket as... Should we put it in the basket of economic? Are you saying it's non-economic, but we should just aggregate the effects? What's your argument here? I think you could put it in both baskets. I think even if you think of it as non-economic, it still has an effect on the market. But I think in that sense, it is economic, right? Because think about what Safe House is actually proposing. They're proposing that city wide and even outside the city, that people come to this location and use drugs, and they're trying to make it as affordable as possible for people. And that is going to have an effect on interstate commerce, because that is going to have an effect on the drug market. And... But we're not allowed to use a very long and speculative chain of inferences. We have to find something as a substantial effect, and we don't have the benefit of congressional findings here.  How do you approach that without having such findings? I think if Congress has said that the market for marijuana, for example, has an effect on interstate commerce, then the market for heroin falls under the same principle. Again, there doesn't need to be specific findings on the interstate commerce effects of a safe injection site. It falls under the larger rubric of anything that affects substantially the market for drugs is going to affect interstate commerce. Here, I think it's... Isn't that the justification for the Controlled Substances Act? The effect on interstate commerce of drugs? That's a big part of it, Your Honor. I think that's right. Yeah. And then just look at other cases that say, once you have determined that a classification has an effect on interstate commerce, whether it's trivial or for compensation or not for compensation, it falls within the determination that there is an effect of this class on interstate commerce. I would agree with that. And you articulated it much better than I have. I was trying to articulate the broad principle in saying that you don't need to have specific findings on this when it comes to injection sites. But yes, that was one of the primary animating reasons behind the CSA, and it would apply here. All right. But I take it that part of your argument is that the CSA is a broader regulatory scheme. But how do we find that this is essential to the CSA? The CSA existed before it. You could have a CSA without it. Maybe it wouldn't work quite as well. But isn't that test of essential pretty demanding? And how do... How do you satisfy it? How do you satisfy it? I think it's been satisfied when you look at what Congress has said about marijuana, for example. Heroin is just a different drug. It's a more expensive drug and a more powerful drug and a more dangerous drug. And so anything that they've said about the market for marijuana, local use affecting interstate commerce, same thing I would say applies to heroin or fentanyl or any of the substances that Safe House is planning to have within its walls. Okay. Congress did not find it essential to have a federal ban on use of these drugs. There's no federal law that prescribes a simple use outside of federal enclaves and the like. So then why is use in the Safe House context essential if a ban on use more generally isn't? Well, there is a ban on use of heroin, unless I'm misunderstanding... Okay. Which statute? In the... Well, the CSA says that heroin's illegal, and the CSA says that there is no medically accepted use of heroin. But where's the... Which statute are you relying on as plugging that hole? Because I think Judge Roth was getting at this, that there's not a federal crime of criminalizing use. You can't prosecute someone for mere use if it's not on a federal enclave or something. You can prosecute people for the use of heroin. I mean, that happens... Doesn't happen a lot because we focus on, at the federal level, the drug dealing and the more serious offenses, but you absolutely should prosecute someone for the use of heroin, which is the reason why... Is it supposed to be possession? Again, Your Honor, I think the best answer to that is if you're using, you by necessity are possessing. So the two... I don't think you can draw a distinction between the two. All right. So what about 844 and the simple possession ban, then? Yes. I mean, I'm relying on the fact that that is illegal for all purposes, and that the CSA specifically says you can't prescribe heroin, there's no medical use for it, because it's on Schedule 1, not Schedule 2. So that distinguishes it from the drugs under Schedule 2 that could be possibly prescribed. Before we have you sit down, let's look back. One thing... I don't know if or... Go ahead, Ms. Eisenstein. Why is... What does the word intentionally do in 8-2 that's different from 8-1? Because intentionally is not in 8-1. Why is intentionally in 8-2? Let's put it that way, but not in 8-1. I'm looking at the language of the statute. I think that, again, it's a check on some of the possible excesses that we were talking about in the hypos, where... It would seem, if you say that 8-1 is directly and 8-2 is indirectly, it's, as we used to say in rural Ohio, kind of bassed backwards. It would seem that 8-2 is direct and 8-1 is indirect. Well, 8-2 is indirect, the way I was thinking of it, Your Honor, because you're talking about a third party that's using the drugs and has the purpose of using the drugs. And I think that 8-2, when you say intentionally, it's the intentional act, the intentional act of renting the place. And then the knowingly is that you know what's going on at the place. But the purpose of the drug activity is the third party there. And there's important words that are in 8-2 that aren't in 8-1 that I also like to focus on, make available for use. That does point towards third party. That's not in 8-1 because, again, we're talking about direct, we're talking about the defendant's purpose. In 8-2, you're talking about make available for use. Make available for use to whom? Well, to somebody. Make available to use, a third party who's actually renting and using the space and using it for the purpose of using illegal drugs. Okay. Thank you. Let's hear from Ms. Eisenstein. We'll get you back in rebuttal. Thank you. We had you up for 47 minutes. I felt like five minutes. Your Honor, may it please the court, Alana Eisenstein on behalf of defendants Safe House and Jose Benitez. Your Honor, Safe House's purpose is to prevent overdose deaths. And its services do not fall within 8-56 because the purpose that it has, preventing overdose deaths, as well as providing medical treatment and services to those suffering from addiction, are not the purpose of the facility. It's not unlawful use or unlawful drug trafficking. And one of the key features that I think you've been talking about throughout this morning is that purpose does matter. It is the essential element of the offense. So you're saying the key feature is that of Safe House. Yes, exactly, Your Honor. And there's an argument that does it make any difference whether it's Safe House's purpose or a drug user's purpose? In other words, if you look at A2, you would manage your control and a place and or unknowingly and intentionally make available for use a place for Safe House's purpose of the unlawful use of a controlled substance. In other words, they don't have to, they're not the one using it, but their purpose is to allow someone else to do so. So does it really make a difference as to whose purpose it is? Well, Your Honor, I think in either event, we have strong arguments that we've been, but I think that the operative actor in question in each, whether you're looking under A1 or A2, is Safe House. And so let me explain why. And I think this is the question of whose purpose controls it. I know it's been a real question that has plagued the courts because of the multi-layered features of the statute. So let me explain why let me start with A1. A1, I think we are in agreement with Mr. McClain that A1, the actor is typically the operator of the property. If you think about the classic crack house situation, crack house scenario, which is what the prototypical example that 856 was directed at, it is the person on site operating the property. And that is the person who had opened, leased or maintained the premises for the purpose of unlawful drug activity. But under A2, the operative, the actor does two things, they manage or control the property, and then they rent it out, they lease it out, they profit from or make available for use to potentially another operator. Or, and then there's a series of gerund phrases that follow all of the drug activities that follow. There are potentially three sets of actors in A2. The statute contemplates that there may be any number of third parties who may be visitors to the site or to the premises. What they're concerned about in each case are the people who control and who own property. This is a statute about the use of property, not about the visitors who may come and go to the property. Okay, so no dispute, A1, the verbs in there don't require the existence of a third party. A sole person can violate A1. Whereas A2 has a number of terms that envision there are going to be multiple people involved. Before we get to parsing A2 and the relevance of a third party's intent, let's assume we agree with you. And it's, we're going to be focusing on A2. I'm looking at your stipulation of facts, paragraph two, appendix 685. Safehouse believes that supervised consumption aids potential treatment in that its participants are more likely to engage in counseling and accept offers of medical care after they've consumed drugs or not experiencing withdrawal symptoms. Now, your response is, our purpose is to ultimately lower use of drugs. But maybe in the long term you want that, but the proximate means you're going to use is to have a purpose of drawing people in to use drugs here. So the hope is they won't repeat it as much. I don't see anything in the law that forbids having multiple purposes. And if you, I don't think you're arguing you can't have more than one significant purpose. So why shouldn't we read this as one of your purposes is have people use drugs here so that you can then help them so they don't do it too many more times? I wanna say two things about that aspect of the stipulation of facts. First, I think that is one facet, which is the susceptibility or the greater susceptibility to treatment of people suffering from addiction at the time when they're not actively in withdrawal. But that really is a secondary purpose. The urgent need for safe house is the overdose crisis that we are facing. It is the imminent and contrary to Mr. McSwain's argument, the necessary precondition of safe house's existence is consumption. The necessary precondition of safe house's existence is the overdose crisis whereby people are dying in... Let me grab that. Maybe it's not a necessary precondition. He may have overstated or... But even if he did, you're not disputing that you can have multiple purposes. Most criminal statutes can be violated by someone who has several purposes, at least if there's significant purposes. You don't take issue with the district court on that. I don't, Your Honor. I think that there can be multiple purposes, but particularly when it comes to use cases, and this is just even in a residential context prior to this type of unique medical and public health crisis that we are in today, whereby someone can face rapid death by virtue of their addiction without close proximity to medical care. But even before that time, courts had treated unlawful use cases with caution and had required a primary or significant purpose to be the unlawful drug activity. What I wonder though is whether you are... You're saying, well, our real purpose is to prevent overdose, and that is a purpose, but it also seems like you're saying, well, that's a benevolent motive. And of course, motive is neither here nor there. You can have a purpose of drawing someone in to use drugs in service of another purpose of preventing overdose deaths, and I don't understand why they're not both significant purposes of yours. Because you have to look at the nature of the facility and the type of services that safe house is providing. You're providing syringes so that people can use them on site. You're then disposing of the syringes afterwards. This is not some fluky or accidental thing that's gonna happen on safe house's premises. You're providing the equipment, and this is equipment that's not for people, diabetics using insulin. This is for people shooting up heroin. How is that a tangential or arbitrary or fluky or incidental purpose if you're giving them the syringes and taking care of them afterwards? So, Judge Bevis, I think your example of syringes for diabetics is a very good example, because Congress recognized when it passed FERA, and in subsequent legislation, the Department of Health and Human Services recognized, the CDC has recognized that addiction is a disease. And so, in fact, Congress recognized in the 2016 appropriations bill that syringes and syringe exchange services could be federally funded, precisely because treatment of addiction and those who suffer from addiction and its consequences is part of medical treatment recognized by Congress. And so, providing clean syringes, providing a sterile location where people can receive treatment for the consequences of addiction. So, this is, in a sense, your example of the diabetic who receives clean syringes. You wouldn't say that someone gives someone clean syringes for the purposes of their diabetes. You would say it's to treat their diabetes. And that's exactly the key distinction here for SafeHouse compared to some of the other examples that the government has put forth, is that the goal of SafeHouse is to treat the after effects of consumption, which is part and parcel of the disease of addiction, that is, in fact, killing unnecessarily our neighbors, our citizens here in Philadelphia. And so, rather than under the current model, a person who receives the syringes at a place like Prevention Point is forced to leave. They are cast out at the very moment when they are at greatest risk of overdose death. And so, SafeHouse proposes to allow them to stay in close proximity to naloxone, to respiratory support, and the kind of medical care that can keep them alive with certainty. So, that is the core purpose of SafeHouse. Yes, it's the means by which they're able to provide that care, to allow people to consume in their place in close proximity, it is. But I think Mr. McSwain's argument that the necessary precondition of SafeHouse's operations is consumption has it reversed. The problem is that the necessary feature of the disease of addiction is the inability to stop consuming, notwithstanding the grave risk of death and harm to oneself. And SafeHouse tries to resolve that problem by allowing people to stay in close proximity to the services that it's offering, which are access to naloxone, respiratory support, and then indeed, when or if a person stays within the SafeHouse walls, to provide the kind of treatment and rehabilitation and access to rehabilitation services. Ms. Eisenstein, maybe we can go to this issue about whether it is a third party's purpose. When I look at A1, you've agreed, there's nothing in A1 that really involves a third party. So, the using looks naturally like it's the person who's opening, leasing, renting, using, or maintaining the place who's using in A1. Well, correct me if I disagree, there are two parties. There's a third party contemplated in A1 too. The actor is the person who opens, leases, rents, or maintains the property. And then there may be any number of third parties who are engaged in drug distribution activity or use of the property. There may be, but it doesn't require it for violation of A1. It doesn't require it, but contemplate the sort of prototypical example of a crack house. The operator of the crack house may or may not be dealing drugs. The operator of the crack house may or may not be, they are maintaining the property for the collection of people to potentially use. But the verbs manufacturing, distributing, or using don't, don't on their face necessitate a call for a third party, even though you could have a third party involved. They're not verbs, they're gerund phrases. Gerund phrases, okay, but the gerund phrase, my point is, if I can get on to A2, the gerund phrase that is being used as a verb, as a verbal use here, you know, it's the object of the earlier verb, is using a controlled substance. Whereas in A2, the gerund phrase ends with, you know, making available, knowingly and intentionally, sorry, the verb make available for use for the purpose, in both cases could refer back to use, but in the second one, it's one person's making available for some distinct use. That's, that's, why isn't that a salient distinction that, that says A2 is really directed towards third parties in a way that A1 isn't? So again, I think A2 involves potential, again, focuses on the use of property. So there might be two different entities or levels of actors with respect to manages or controls, which typically A2, just think of the landlord scenario, typically the owner or the landlord, the someone who's distant from the property, who then rents it, leases, profits from, makes available for use in the sense of giving control of property. This isn't, the term make available for use is a really awkward one in this, in this particular. But it is the most salient distinction in the list of the verbs in A2. And so Congress wrote A1 involving using directly, and A2 is making available for use, textually contemplating an additional level of remove in A2 of someone else using. Right. I agree. And so in the make available for use context, though, I think you still have to look at it in context with the other words in the statute, which include rent, lease, profit from, all suggesting giving over the control of property. And so actually A2 is really an opposite to safe house at all, because A2 is not giving over the use of property to anyone. Safe house will be the operator of the property. Safe house staff will be the only one provide operating facilities and providing its services. Yes, there will be invitees who come in and people who are participating, but those people are not the ones who have operative control over the use of property or the purpose of the facility. And that makes sense because it would be extremely odd for a statute about the intentional knowing and purposeful use of property to depend on the various people who come and go and the reasons that they come and go from the property. Ms. Eisenstein, can we talk about surplusage? I think one of the strongest arguments for the government is it's really hard to come up with examples of conduct that on your reading violates A2 that isn't already criminalized by A1. Please tell me what additional reach A2 has beyond A1. Right. So the verbs and the actions in the statute are are totally different. And A1, it is a person who is the one maintaining the property, open, leasing, renting. They're the ones using the property. A2, as I said, typically you think of it as going after the owner or landlord of the property, the person who manages or controls the property and then rents it out, leases it out, profits from or makes the property. Why wouldn't that person be covered by A1's reference to lease or rent? Why couldn't that person be prosecuted under A1 already? So I think if you look at the way the district court treated those verbs, I think it's very telling. So lease and rent have two different potential meanings. OK, it could encompass both in A1. Or to be the lessor, right, the person who rents it out or the person who rents the property. So the better reading of the statute based on the way in which it's been utilized and developed is that the terms rent and lease in those two statutes are generally speaking, referring to two different activities because you're managing and controlling the property as owner, lessee, agent, employee, occupant, mortgagee, and then rent, lease, profit from or make available for use as an outward facing verb. Maybe my question wasn't clear. Give me the factual hypo that you submit is not prosecutable under A1, but is prosecutable under A2 on your reading. I think it's the distant landlord who is not at the property, who leases the property to a third party with the knowledge and intention that the property is going to be used for the purposes of unlawful drug activity. Let's say that we think that the words knowingly lease for the purpose of an A1 cover that activity. Is there any other activity? I mean, you're having to constrict the meaning of the verb rent. Is there any other activity that's covered by A2 that isn't covered by A1? Yes, I think that if somebody who has that management and control, I mean, look, I think is there overlap? Surely there is. But I think that that there is the statutes are directed at a different class of actors. So I think that I'm not disputing that there are two classes of actors in A2, but we're actually three classes of actors in A2. I think the difference between Mr. McSwain and our position is in A2, there are two potential classes of actors, the operator and the third party. Why did Congress add this in? There'd be no reason to constrict the verbs lease or rent not to reach the landlord, the, you know, maintain would get the property managers. Just not clear to me why A2 is in there at all on your reading. Well, I think that, well, let's just say they didn't lease or rent. Let's just say they made it available for you. So, for example, you are the owner of the apartment and you just allow your boyfriend to run a crack operation while you're at work. That would be covered by A2, but I would think not by A1 because you haven't been the one who is using it for that purpose, who is maintaining it for that purpose. And you didn't lease or rent it. So I think that even the more informal arrangements are covered. But still, the term for the purpose of has to go to the actor. So under either scenario, and by the way, Chen, which the government relied heavily on, looked at 16 statutes that use the phrase knowingly for the purpose of, and in each case came to the same conclusion that the purpose goes to the actor, not to various other third parties who might be downstream. It's a nonsensical result to have the criminal liability turn on the actions of third parties that are not those of the actor themselves. And here, I think it's important that the case is not a distant owner. They are the operator. Is there any criminal statute that actually makes the intent of a third party an element of the prosecution of the offender? Your Honor, I'm aware of none. Isn't there commonly Pinkerton liability based on the co-conspirators doing something with an intent? You can be liable for someone else's crime as if you're the principal without having had that intent yourself. Your Honor, I think that when you talk about a conspiracy, it requires a meeting of the minds and to have a common criminal purpose. So I disagree that criminal conspiracy under Pinkerton liability changes on the third party's intent. It requires your own purpose to join in the objects of the conspiracy and sometimes an overactive purpose. But if you join knowingly and intentionally, it could be the other person who has the purpose of the subsidiary crime. I don't know that I agree with you, and I think it would be particularly unusual to have a conspiracy involving purpose. So I think some of the Pinkerton liability cases are not ones where purpose is an actual element of the offense. And I think that's really not only the key distinction, I think that this provides the limiting principle that as your hypothetical displayed, that the government was unable to articulate. So in each of your hypotheticals, there were answers like it's a matter of degree, which, by the way, is not consistent with how the government has prosecuted 856, which includes even single time drug distribution events. But our interpretation of primary purpose, first of all, going to the actor who manages and controls and operates the property, which is us. And second of all, requiring a significant primary purpose effectuates Congress's intent. I mean, if I if I can just point you to some of the case law that has discussed this. So we cite in our brief, the Shetler case, the Verner case, the Lancaster case, and Judge Reinhart and Shetler noted that Congress's purpose when it fought when when it enacted 856 was to target those who use their property to profit from drug sales. And while it's not limited to commercial drug transactions, when it comes to possession cases, the court held they require evidence beyond manufacture for personal use to sustain a conviction. Verners, the Tenth Circuit held the same thing, that the that the that the statutes designed to punish those who use their property to run drug businesses and therefore those who just involve pure personal use isn't going to suffice. The same thing was true for every other court to evaluate this. And there's a question about the five circuits cited by by the government here. I mean, don't the circuits mostly line up on this position that it is, in fact, the third party's purpose? So in turn, in turn, that's the question of whose purpose. I was talking about the question of what purpose and the requirement that the primary purpose have particular weight when it comes to simple possession, in particular because of the severity of the crime. So mere possession is a misdemeanor misdemeanor. So what is the line by transforming the use of the simple use of drugs at a property from a simple misdemeanor into a 20 year felony? OK, except under the guidelines, this would be a zero to six months for your for for Mr. Benitez. Well, it's that type of differential is significant and one that the court looks at in bond. The court has looked at small and the prosecution history, I think, a significant, you know, with respect to those issues, too, which is that this would be the idea of prosecuting a pure use case until this process, until this declaratory judgment was brought in 33 years, the government could say no example of a simple use case. And so if you look at bond and small, that is significant. But let me go back to your question about whose purpose, because I think these five circuits cases are are worth focusing on. I do think Chen made a misstep, but it was one that wasn't important to the resolution of the case, because in Chen, the owner, if you recall, was an owner of a motel that were cocaine. The testimony was to be purchased in every room of the motel. And indeed, she was encouraging those drug sales in order to enable the drug dealers to supply their ranch or their leasing to her. So that analogous here, you're encouraging the use here so that you can provide services. It's non-economic. Maybe that goes to commerce calls, maybe not. But people are coming here not to shoot up their diabetes, insulin. They're going to be coming to shoot up heroin and other controlled substances that we are encouraging them to use. They are encouraging them to use their to receive medical treatment. I think that's an extremely important distinction. The only reason why we are permitting people to stay in proximity in the place is for the purpose of giving them sufficient proximity to care for it to be effective. You have a benevolent motive. You have a good purpose. But that purpose is piggybacking on a purpose of having people come in to use drugs so that you can fulfill these other purposes. Well, you know, I'm especially disappointed because even for the people who are coming in and I want to get back to Chen, but let me just make this one point about the people coming in. Why are they coming to safe house instead of remaining where they are, instead of being in their home, instead of remaining in whatever place they are out on the street? Mr. McSwain suggests it's because they're more comfortable. But the distinguishing feature of safe house is the availability of lifesaving care. People are coming to safe house because they don't want to die of addiction. And from the addiction from which they're suffering because they suffer from a condition that is compelling them to use drugs, notwithstanding the grave risk that they may die. And Mr. McSwain keeps talking about heroin. Unfortunately, the drug supply in the city is primarily fentanyl and fentanyl can kill someone within minutes, whereas naloxone is immediately present and the access to they will survive with medical certainty. That was the point. The point here is you're right. The lives may be saved and there's a really wonderful motive behind what safe house is doing. But we're stuck with the words of the statute. And so often, you know, as we've mentioned, it was mentioned in the argument of Mr. McSwain about Bostock. Well, you look at Sedema, which was, you know, Congress passes RICO. And the person at the Notre Dame Law School who drafted the statute said that obviously it applied to organized crime. Fifteen years later, Supreme Court says, well, it applies to civil RICO, even though that was never the intent, because that's what the words say. So we're stuck with the words here. And when I get to these words, I'm trying to figure out what why is intentionally the word intentionally in a two, but not in a one. Let's start with that. The term intentionally can have a couple of meanings under criminal law, but generally speaking, that the word intention can be synonymous with purpose, but it can also mean the specific intent, the reason for the activity. And so I think it underscores the idea that purpose is a critical element of the statute. And contrary, I absolutely agree that benevolent motive is insufficient, Judge Bevis. But but keep in mind that motive and purpose are different. And our our purpose is still is part of the terms of the statute is that this is the this is the element of the statute. If you listen to the DOJ and Mr. McSwain's position, they keep reverting back to situations where, you know, drug activity is occurring, but they fail to at each time state for the purpose of because actually 856 is a fairly narrow statute. It's directed at maintaining premises for the purpose of drug activity. It is directed at the type of location where drug operations are promoted and where there is where the premises are being used to advance drugs. But I wonder if there's a connection. So you're you're agreeing the intentionally has something to do with the you've agreed that a two is different from a one that a two really is is geared towards third parties, even though a one could involve some third parties. A two has a bunch of terms that really are about third parties. And the other difference in terminology is a two has this intentionally. So might be intentionally refer to, you know, it's being deliberate and not by accident that the other person has the purpose. I mean, the intentionally seems to have something to do with the presence of the third parties. And I'm wondering what your read is of what intentionally, you know, it often means deliberately. It often means absence of mistake or accident. How is intentionally doing work in a two here that explains its presence there? I think it's a question of specific intent and I think it's underscored that we're making about purpose. But I do want to talk to your point about Chen and these other cases, because I think when we talk about the scenario in Chen, it highlights the three levels that are present in a two. The motel operator was the manager and controller. She was giving the use of the rooms to drug drug traffickers. And then there was a third group of people, the people coming and going to purchase drugs from the facility. They were not the operative. Their purpose and coming and going was not the operative question. Right. So. So even though I think Chen made a misstep, actually, it was not necessary for Chen because of the nature of the activity going on in the rooms and the people operating it. And because there was, in fact, three roles by three different people. A difference here is Safe House is not making available for use its facility in the operative sense of the word, in the sense of giving over relinquishing dominion and control of its facility to any third parties, the people who are coming. Let me use an example. If you had an emergency room, you wouldn't say that you make the emergency room available for use for the patient. An emergency room, a hospital, makes the emergency room available to the doctors who have admitting privileges to treat the patients who come in when they have an emergency. So I think that turn of phrase, make available for use, you have to look at with respect to the concept of E-56, which is which is focused on the control of a property. But might it not be as simple as this intentionally make available for use a place for the purpose of persons coming in and using a controlled substance illegally. Just. Simple as that. But I think if that were the interpretation of the statute, Your Honor, then Mr. McClain's answers to the hypotheticals about the parent who allowed their child to come use at their residence or the storage facility where someone was using there would be different. So I think that in order to resolve and to provide a limiting principle where for a parent who allowed their child to use in front of them would have to be resolved differently if that were the case. But as the great Ed Becker, your former judge you clerked for, would say that's the next case. Well, it's not the next case because because, Your Honor, this is not a hypothetical. I don't think that the obligation of medical practitioners to their service providers to those that they care for is any different than allowing those in their care to stay right in front of them so that they can provide care instead of the current situation, which is being forced to put people out into the street. Literally, that is what happens today where they're out of the reach of care. Ms. Eisenstein, I don't know if my colleagues want to stay on the statute, but I do want to make sure we talk a little bit about the Commerce Clause. When Gonzalez versus Raich, which is the most recent and maybe most apposite precedent, defines economic opportunity as production, distribution and consumption of commodities. Isn't this consumption of commodities? How is safe houses conduct not economic? Yeah, so I think that the key part, it goes back to the use of property. So this this is not a statute about consumption or the activity is not about consumption. It is about the maintenance and use of property. And that is entirely local. It is local and non-economic. And so the use of property for for, amongst many other things, people coming in from Philadelphia. OK, that may interest a people coming in from New Jersey, not people coming in from Delaware, not getting fentanyl strips wherever they come from across state lines. I mean, this seems to be almost quintessential interstate as opposed to intrastate. And even if it is intrastate, you've got Raich. Let me say something that's interesting. There's no jurisdictional element to the statute. Drug use is not an economic activity. And Congress specifically excluded drug use when it was making its findings. It made findings only with respect to possession. Except that the findings in the CSA 801, you know, 3C, 4 and 5 and 6 in the footnote 20, I think, of Raich talks about the ways in which interstate drug possession is tied to interest, interstate commerce. Why? You know, there are findings in this statute, but can't the government piggyback on those on those findings? I mean, I think your response is, well, this isn't about money. But in Raich, both of the challengers to the law, one of them was growing for her own use. The other one was getting it for free. That was no more economic than this use. You're fading out. I can't hear her at all. OK. Can you hear me now? That's great. So so this is back to the purpose as well. There is the concept of whether or not safe house, which is providing the medical services that it provides, facilitates drug use or drug possession in any way above and beyond what is already contemplated by Congress and the rest of the federal scheme. So we talked about clean syringes as being something that's federally permissible. And is there anything that carves clean syringes out of the criminal law? Yes. Congress has appropriated funds. First of all, it's not an appropriations bill. Give me a citation to a criminal law that carves out syringe. It's a specific about what is prohibited and it does not prohibit provision of syringes or consumption. Did you have a citation as to why that's not aiding and abetting criminal law doesn't default to criminalization. It defaults to legality. So unless it's specifically prohibited, it's permitted. And in fact, Congress in the 2016 Appropriations Act, in Section 58, I believe it's 518, actually allowed for federal funding of clean syringe program. So I think it's clear that clean syringes are permitted and it is clear that all of the other activities, Narcan and Naloxone, are federally funded and permitted under the CARA, the Comprehensive Addiction and Reform Act. And so you're allowed to, so the activities that Safe House is doing is not facilitating drug in any way above and beyond what Congress contemplates in the necessary activities to treat the disease of addiction. And yet, so that goes back to your Commerce Clause argument, Your Honor, because here the use of the property is not promoting or facilitating or enabling the possession. The possession can be illegal and no one is saying it's not. No one is saying that it is somehow permissible under federal law to possess drugs that are otherwise unlawful or prohibited under 844. The question is not whether the participants violate that law by walking in with a small personal use quantity of drugs that they obtained elsewhere in order to obtain medical care in the event they need it. So there is no facilitation of that possession and therefore the use of property for a medical purpose, and I think you can look at Argonne and Gonzalez versus Gonzalez for this, that the Congress seeks to regulate the practice of medicine and quite the opposite unless the controlled substances say so. And I think Jones is really the better case than Raich to look at. Jones with the arson. We dealt with the arson statute and it said hardly a building in the land would fall outside the federal statute's domain if that arson statute were read as broadly as the federal government suggested. And the same is true here. What about Wickard? Wickard said, you know, growing grain for yourself, no money exchanged, feeding it to your own animals, winds up affecting the market. Right. So that's the question. And I agree, homegrown weed and Raich is about possession, but this is about the use of property, not about possession. And that's why I think Jones, not Raich, is the better reading. And as your Honor pointed out in the questions, Judge Vivas, the use here, which lacks the limiting or economic or commercial linkage to the activities that safe house is engaged in, is determinative. There's certainly no jurisdictional element that it involves some kind of interstate commerce. So I think in terms of constitutional avoidance, certainly the federalism principles suggest that regulating local use of property to provide medical care in a non-commercial way to people who have merely possessing drugs and using them, something that Congress made their findings on, suggest that our reading of the statute is the superior reading. Let me see if I understand Raich. Was Raich to claim that the marijuana use was intrastate and therefore it was not a, it does not implicate the Congress clause. Is that correct? It's homegrown marijuana because it found that the market, much like Wickard v. Silver, and found that the market for whether it's intrastate or homegrown was promoting the if you're using and possessing and growing it locally, it's still promoting the market in effecting the interstate market. But that same can't be true for a facility that doesn't in any way promote or facilitate even the possession, but rather just provides care and treatment for people who are using. When you go back, and I go back way before you do, but when I was in law school, we always were taught that Wickard was the high watermark of interstate commerce. And it's sort of parked in the corner, like the relative at Thanksgiving, you just put them in the corner and leave them alone, don't touch it. And then you see this case in 05, which brings it out front and center. And when you do that, and it talks about Congress expressly found that the drug has no acceptable medical uses. And so any purpose, even this intrastate facility, it implicates the commerce clause. How do I get around that? Well, actually, Rick was really about the necessary and proper clause. I mean, it did look at Wickard and brought that front and center, but it found that it was also necessary and proper to the overall scheme in order to basically you couldn't distinguish the homegrown possession from the rest and that it as well as the cumulative effect. The theme was kind of findings were not made with respect to 856, which, by the way, was enacted separately from the rest of the controlled substances. So that leads to this question. If it's necessary and proper that you enforce 856A2, the consequence of not doing so, one could argue in this case, is that so many other entities or persons will come out and say, my purpose is not to have some type of illegal drug use. My purpose is, as Safehouse says, to make sure that anybody who really has an addiction is safe. My purpose is to make sure that people are off the street. My purpose is to make sure that the safety of downtown Philadelphia or South Philly is protected by having these people off the streets. Who knows? And then when you get those, you start getting into policy. And that's why I keep coming back to the words of the statute, because the one thing that's sort of drilled into us is not to get involved in policy. So, Your Honor, I think that the policy that is, you know, I don't agree that this is about policy. I think that courts have uniformly treated with caution cases involving just mere possession and mere personal use inside of any facility that's not an overt crack house or something that is which is how will you limit the government from prosecuting every mother and father who tries to treat their child? How are you going to stop the government from prosecuting the homeless shelter that allows people to use or even direct their activities towards people suffering from addiction and doesn't, knowing that they would use and are using in the facility. And that's the Housing First program that by federal policy, federal policies, HUD's own regulations and guidance say that someone should not be evicted from a federally funded HUD facility, even if you know they're using drugs within it. So maybe that's a reason to worry about the word intentionally, but maybe, maybe Mr. McSwain, you know, bites that bullet and says, yeah, maybe they could all be prosecuted as a matter of procedural discretion. I mean, I guess the question is, what's the ambiguity in the text that makes it at least ambiguous such that the text tells us to construe it narrowly? Because I don't understand that, you know, just because something was said in the legislative history that we would, or because it's bad policy that we would narrow it. I don't, I'm not saying that, Your Honor. What's the phrase in the text that you think narrows it? I don't think it's ambiguous. I actually don't think it's ambiguous because the text makes it perfectly clear that the maintaining of property is an essential element of the statute. That's exactly the piece of the statute that the DOJ repeatedly ignores in their arguments. And in fact, the very first page of the summary of their argument says if a person knows drug use is occurring according to DOJ, that's sufficient for prosecution. No, Congress right there in the statute limited 856. They did not intend 856 to be this kind of broad scale regulation of any property where drug use occurs. It requires that the purpose of the property be for drug activity, for unlawful drug activity. And when it comes to simple possession, courts have given that primary purpose and significant purpose test real weight. So, for example, I mean, the D.C. Circuit stated that Section 856 cannot be reasonably construed to criminalize simple consumption of drugs in one's home. That is the uniform view. Russell VI Circuit said each court to have addressed the issue has found the same way. That was in 2010. The Seventh Circuit and Church came to the same conclusion. Congress intended to create a distinct offense aimed specifically at criminalizing the use of property for narcotics-related purposes. So when you look at safe house, and I think Judge Roth's question to Mr. McSween about you have to look at the side of the room where safe house's staff and facility are operating. Mr. McSween wants you to focus on the users, but you have to focus on the actor, which is the person maintaining the property and the collection of services and the nature of the facility. This is a medical facility. And so, Judge Ambrose, to address your concern, of course, there will be cynical people out there who will try to disclaim that their purpose was to promote drug use. They may say a whole range of excuses. Well, that is a common occurrence in criminal law when someone says they don't have the mens rea sufficient for the statute. That is a question of evidence and proof. And here we have stipulated facts. And we have really a lack of dispute on the part of the parties that safe house's purpose is, one, to provide life-saving care to people suffering from the disease of addiction. Let me ask you a question. If safe house could only have the consumption room without the other facilities that are part of safe house, would they open just a consumption room? Your Honor, I think not, because safe house is a not only medical but public health-driven approach to overdose prevention services, which is informed by the medical experts and public health experts who have helped form it. So, keep in mind, safe house didn't come, it wasn't an idea out of nowhere. This was an idea, this is a concept that has been in existence for 30 years. It's been studied extensively. And it came out of specific recommendations of experts in the field who believe that the collection of services is what makes safe house an effective intervention. But even if it were, when you talk about the consumption room, what is going on there? There are, yes, there are people who may be using drugs, but for what reason? Because they want to stay alive. Because they are suffering from a disease that is compelling them to use the substance that may kill them, and they want to stay right where care is available. Think about an emergency room where someone came in with an imminent heart attack. And if the doctor said to them, sit right there in the waiting room, and in case you have a heart attack, I'll be right there to help you. You wouldn't say the waiting room was for the purpose of having a heart attack. You would say it was for the purpose of being proximate to the emergency care. And the same is true here. But the purpose of the participants and the purpose of safe house is to provide that urgently needed care if someone were to overdose, stop breathing, and need rescue medication. So I think that when you look at, you know, even the consumption room in a vacuum, I think that there's still a strong and valid argument that the purpose of it is for that life-saving care, not for consumption. And I just want to say one more thing about a matter of degree, which is, you know, Mr. McSwain argued that if there was one kid in the house who came there to shoot up to the parents could observe them, that would be okay, and maybe two. Well, that doesn't really answer the question for safe house. If we had a facility that only had room for one person, we would do it because one life is worth saving. And so if it were one person at a time, then fine, we will do it one person at a time. But I submit to you that that is not how the statute, what the statute turns on when it comes to defining and examining the primary purpose of the facility. This is a public health and medical intervention designed to mitigate the severe harms of opioid addiction, not in any way the type of facility that was contemplated by Congress when they passed Section 856, which are predatory activities that try to promote for-profit drug operations. Thank you. Thank you very much. Any further questions from my colleagues? No. Okay. Thank you. That was almost 48 minutes. Mr. McSwain, we're going to keep you in your five minutes. No more. Thank you, Your Honor. I'll be brief. Actually, something that you said really struck me when you were talking about how this is a statutory interpretation case. You have to look at the words of the statute. And what I heard, you know, in safe house's argument, which I think is consistent with what they've been saying throughout this case, is they are making policy arguments. They are talking about what they consider to be an emergency. They are talking about the need for overdose prevention. They are talking about, for example, that you can die if you take fentanyl within just a few minutes. I don't disagree with any of that. And what we tried to be clear about throughout this case is that we're on the same side of safe house and that we're very concerned about the opioid epidemic and trying to do everything we can to fight back against that and to save people's lives as well. But it has to be done within the bounds of the law. And all those arguments that I hear about emergency and the like, it's all about the urgency. It has nothing to do. It has nothing to do with the words of the statute. It has nothing to do with interpreting the language. And I don't think I'm being cynical by saying that. I think I'm doing my duty by saying that. And when you look at the words of the statute, there's no way to interpret A1 and A2 the way safe house wants to in a way that makes any sense. They just completely overlap. It leads to all sorts of absurdities. Again, my example of the crack dealer who could say, I'm doing this because I want to make money. Under safe house's reading, that crack dealer goes free under the statute. That doesn't make any sense. On the point about can you have a third party's intent matter under criminal statute, I mean, the answer to that is absolutely. I mean, think about the example of conspiracy. You need to have a meeting of the minds. If you don't have a meeting of the minds, and you need both parties to be thinking of something, or the two, the defendant and the third party, be thinking the same, having a meeting of minds, there's not going to be any liability. You could also think of victims of crime. There's all sorts of crimes that don't become crimes if the third party, the victim, doesn't have the right mental state. If somebody consents to something, for example, there's all sorts of economic crimes, there's all sorts of sexual crimes. There wouldn't be crimes depending on the mental state of somebody other than the defendant. Another point I wanted to make is about this idea of necessary precondition. If safe house doesn't like those words or if the court doesn't like those words, then another way to think of it instead of necessary precondition is defining characteristic. It is a fact that the defining characteristic of safe house is the consumption room. That's just undisputed. There's no reason that safe house would exist without the consumption room. Again, everything that they are planning on doing already exists at prevention point, except for the consumption. And then lastly, I would say, what work is the word intentionally doing? That's come up a lot. Judge Amber, you've been focusing on that. And I think it does do some work, but I think we don't need to overthink it. Like you described, it could be that it means that the person who is managing or controlling the place, safe house, does something intentionally. They intentionally rent, lease, or make available for use. If you're talking about a third party, the place for the third party's purpose of drug use. And they do that knowingly. So knowing does work as well. So I think that intentionally does do work in the statute under the reading that we're putting forth. And one final point, not four minutes, I'll try to finish it up quickly, is these hypos are all very interesting, and they're all very important. And I think I do have a reasonable answer for all of them. I certainly did my best to deal with them. But as Judge Amber said, that's not this case. This case is not a hypo where you have somebody in a home, one person doing drugs. And also, I don't think it's realistic to say that safe house is just going to serve one person. No, that's not at all what we're talking about. That's not the factual record that you're talking about. Safe house is inviting scores of people to come into one place, one piece of real estate, and to inject themselves with heroin or fentanyl or what have you. And that, in our view, is unique. Thank you very much. Thank you very much. I would ask for the transcript be prepared of this oral argument and split the cost, if you would. And actually, would the government mind picking up the cost for the transcript? That would be fine, Your Honor. We'll just have the government do that. Both of you make me feel old. I remember when both of you were clerks, and it didn't seem that long ago. And as they say in South Philly, you've done good, both of you. And thank you very much for extremely well-presented arguments. We'll take the matter under advisement. And again, you have our appreciation.